# Lehigh Valley Coal Company, Appellant, *v.* Girard Trust Company.

*Mortgages—Corporate mortgage—Sinking fund—Coal lands.*

Where a mortgage on coal lands, given to a trustee by a mining company, to secure an issue of bonds, provides that "where all said bonds shall have been purchased, or when the amount in the hands of the trustee shall be equal to the principal and interest of the bonds then outstanding the payments into the hands of the trustee for a sinking fund shall cease," the mortgagor may cease to make annual payments into the sinking fund, whenever the amount of the principal and interest then due and accrued upon the bonds outstanding is in the hands of the trustee, provided however that the mortgagor shall continue to pay all interest on the outstanding bonds as it accrues, and continue to keep in the hands of the trustee an amount of securities sufficient to pay all outstanding bonds.

Mr. Justice Moschzisker dissents.

Argued Jan. 18, 1911. Appeal, No. 216, Jan. T., 1910, by plaintiff, from decree of C. P. No. 5, Phila. Co., Sept. Term, 1909, No. 4,340, dismissing bill in equity in suit of Lehigh Valley Coal Company v. The Girard Trust Company, Trustee. Before Fell, C. J., Brown, Mestrezat, Potter and Moschzisker, JJ. Reversed.

Bill in equity for an injunction. Before Staake, J. The facts are stated in the opinion of the Supreme Court.

*Error assigned* was decree dismissing the bill.

*John G. Johnson*, with him *James Wilson Bayard*, for appellant.

*John Hampton Barnes*, for appellee.

Opinion by Mr. Justice Potter, April 10, 1911:

This appeal brings before us for construction the second clause of the mortgage of the Delano Land Company to the Girard Trust Company, trustee, dated December 1,

1891, to secure the payment of $1,200,000 of bonds, and providing for payments to a sinking fund. The mortgagor is required to pay to the trustee ten cents for each ton of coal shipped during each year from the mortgaged premises, and not less than $30,000 in each year. This obligation of payment to the sinking fund is limited as follows: "And when all said bonds shall have been purchased or when the amount in the hands of the trustee shall be equal to the principal and interest of the bonds then outstanding, the payments into the hands of the party of the second part for a sinking fund, as aforesaid, shall cease." The coal has evidently been mined more rapidly than was expected, and the payment of the minimum royalty has created a much larger fund than was anticipated; so large indeed, that an amount more than sufficient to pay off the bonds, principal and interest to date, is now in the hands of the trustee. But the bonds do not mature until 1932.

The question here involved, is whether the language of the agreement requires the payment to the trustee of an amount equal to the principal of the bonds, and the interest accrued thereon to such time; or whether it requires the payment of a sum equal to the principal of the bonds, and all the interest which may accrue thereon until the date of their maturity. If the interpretation first suggested is correct, then the appellant has already made payments sufficient to meet the conditions. If the other suggestion is to be accepted as the proper meaning of the agreement, then a sum largely in excess of that required to pay the bonds at maturity must be paid by appellant to the trustee. The total amount of bonds now outstanding is stated as $1,082,000. It appears from the record that the amount paid in and held by the trustee in the sinking fund, in securities and cash, is now $1,093,655.08. If appellant is compelled to continue further sinking fund payments until the maturity of the bonds in 1932, the additional amount received by the trustee with the accumulated interest thereon, will be,

as is estimated by the trial judge, more than $1,000,000, and the normal accumulations from the sinking fund will reach a further sum of more than $1,500,000; so that in round numbers the trustee will then have a total sum of considerably more than $3,500,000 to meet a demand for the payment at maturity of only $1,082,000 of bonds. The accumulation of such an excessive and unnecessary fund can serve no useful or wise purpose, and could hardly have been within the contemplation of the parties; nor can we see any compelling reason for the adoption of a construction of the wording of the agreement which would lead to such a result. If the plain words of the agreement required this extraordinary course to be pursued, there would be no alternative; but the provision is that payments to the sinking fund shall cease "when the amount in the hands of the trustee shall be equal to the principal and interest of the bonds then outstanding"; and this may fairly be taken to mean, the amount of the principal and interest then due and accrued upon the bonds outstanding. Especially is this true when we remember that the office of the sinking fund is to take the place, as security, of the coal mined and taken away from the mortgaged premises. If a fund sufficient to meet the principal and the accrued interest upon the bonds be always maintained in the hands of the trustee, it is all that the bondholders have any right to require. Such an amount, as above stated, is now in the hands of the trustee. Appellant through its counsel states in the printed brief of argument that it is willing that the accumulation of the income from the securities now in the sinking fund shall be added to that fund; and, if this be done, there should, in 1932, be in the hands of the trustee, a sum vastly in excess of what will be required to meet maturing bonds amounting to $1,082,000. Surely the margin from that source is quite sufficient to protect the bondholders from any reasonable contingency that may arise. The possibility of any failure to meet the payments of interest is very remote. The bondholders have the obligation of the

mortgagor, or its successor, the appellant, and the further guarantee of the Lehigh Valley Railroad Company, and the security of the mortgaged premises, now shown to be worth more than $900,000. In view of all these circumstances, we do not see that the interests of the bondholders can suffer in any way, if the appellant is relieved from making further payments to the sinking fund, provided that it continues to make payment of the interest which may from time to time become due and payable upon the outstanding bonds.

The decree of the court below dismissing the bill of the plaintiff is reversed; and the bill is reinstated; and it is further ordered and directed that a decree be entered granting to the plaintiff the relief for which it asks in the first and third prayers of the bill, which is in substance, that so long as the trustee has in the sinking fund provided by appellant, securities sufficient to pay all outstanding bonds, and while appellant continues to pay all interest due on such bonds as it accrues, it be relieved from making additional annual payments to the sinking fund; and that so long as these conditions continue, the appellee be enjoined from foreclosing the mortgage for default in the annual sinking fund payments.

Mr. Justice Moschzisker, dissenting:

I dissent from the majority view for the reasons stated in the following excerpt from the opinion of the court below: "On the basis of the conditions existing to-day, the continuance of the payments by the complainant into the sinking fund for a future period of twenty-two years is undoubtedly onerous and apparently unnecessary, but where is there any guarantee that the conditions existing to-day will continue during the next almost quarter century? What may be the market value of the securities in the sinking fund during all of that time? What assurance beyond all question is there of the continuance of the valuation of the coal lands relied upon to-day as a security, upon their assessed valuation of $905,037? If

they are continued to be mined during all of that period, may not their treasures of coal become exhausted? What assurance have the bondholders, who are the real parties in interest, that the excellent guaranty of the Lehigh Valley Railroad Company, under the conditions existing to-day, will be as valuable during the whole period of twenty-two years? What may or may not be the rates of interest existing during all of that period, and what the effects upon corporations of ill-advised national or state legislation. . . . What may be the value of gold coin during this period? It is apparent that the most optimistic person cannot prognosticate conditions, or their effect, for such a long period in the future.

"It is clear that the trust continues until the bonds are all paid and that those holding them that is 'the registered owners or the legal representatives of the registered owners' are entitled to hold them until January 1, 1932, and to receive interest thereon from January 1, 1892, at the rate of five per centum per annum, payable in like gold coin, as the principal is to be paid. These payments are to be made without deduction for any tax or taxes which may be payable under any present or future law of the United States of America or of the State of Pennsylvania, . . . . the company agreeing to pay any such tax or taxes. . . .

"It is the holder of the bonds who is entitled to the security . . . .; the mode prescribed in the said mortage for the recovery of the principal and interest of said bonds being exclusive of all others.

"The obligation of the complainant beginning with January 1, 1893, and continuing annually thereafter during the continuance of the trust, is to set apart for a sinking fund and pay over to the . . . . (trustees) . . . . a sum equal to ten cents per ton for each and every ton of coal of sizes above pea shipped during the preceding year (provided, that in no case shall such sum be less than thirty thousand dollars in any one year), to be appropriated to the purchase of such of the said bonds as

can be obtained at prices not exceeding par, with accrued interest, which bonds shall be forthwith cancelled, and in case the bonds cannot be procured at or under par, with accrued interest, then the said trustees or trustee for the time being shall invest the amount then remaining in the said sinking fund in such securities (including the bonds intended to be hereby secured), as shall be approved by the party of the first part, which said securities and the proceeds thereof, when sold, together with all accumulations of interest thereon, shall form a part of the said sinking fund, and be applied to the purchase of bonds as aforesaid, when the same can be secured at or below par with accrued interest.

" Can it be then held that it was the intendment of the parties, that is, of the complainant, of the bondholders to be secured by the mortgage, and of the trustee mortgagee, that the words: 'And when all said bonds shall have been purchased, or when the amount in the hands of the trustee shall be equal to the principal and interest of the bonds then outstanding, the payments into the hands of the party of the second part (the respondent herein) for a sinking fund, as aforesaid, shall cease,' means only the 'interest' to the date when the amount of the sinking fund equals the amount of the then outstanding principal of the bonds, and that it does not refer to the 'interest' recited in the first clause, viz.: which is to be paid to the holders of the bonds . . . . semiannually 'as the same shall become due and payable according to the terms in the said bonds contained and on the days therein respectively mentioned for the payment of the same,' which, as recited in the bonds, is, already shown to be 'interest thereon from the first day of January, 1892, at the rate of five per centum per annum, payable in like gold coin semiannually on the first day of the months of July and January in each year,' until, 'the principal sum of the bond shall become due and payable' . . . . on the first day of January, 1932? We cannot so interpret this contract."

With all respect for the opinion of the majority, so to interpret the contract, to my mind, is to change the plain meaning of the words used in the bond and to reform the instrument to the possible prejudice of the bondholders. It seems to me that the words, "when the amount in the hands of the trustee shall be equal to the principal and interest of the bonds then outstanding," mean the principal and an amount equal to all interest which shall thereafter accrue to the maturity of the bonds.

I would affirm the decree as entered.